## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TYRECE DERRICK WILLIAMS, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 25-cv-13620 |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, STEPHEN | ) | |
| GAWRYS, RAPHAEL RAMOS, WILLIAM | ) | |
| O'DONNELL, JOHN LEONARD, GERI | ) | |
| LYNN YANOW as special representative for | ) | |
| the ESTATE OF ERNEST HALVORSEN, | ) | |
| EDWARD KIJOWSKI, EDWARD | ) | |
| MINGEY, STEPHEN KUHN, ROBERT | ) | |
| BIEBEL, the CITY OF CHICAGO, PAULA | ) | |
| BECKER, and COOK COUNTY. | ) | |
| | ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, Tyrece Williams, by his attorneys LOEVY & LOEVY, and complaining of Defendants Reynaldo Guevara, Stephen Gawrys, Raphael Ramos, William O'Donnell, John Leonard, Geri Lynn Yanow as special representative for the Estate of Ernest Halvorsen, Robert Biebel, Edward Kijowski, Edward Mingey, Stephen Kuhn, the City of Chicago, Paula Becker, and Cook County, states as follows:

### INTRODUCTION

1. Plaintiff Tyrece Williams was only 22 years old when notorious Chicago Police officer Reynaldo Guevara and his co-conspirators at the Chicago Police Department and Cook County State's Attorney's Office framed him for a murder he did not commit.

2. Plaintiff was wrongly convicted of murdering a boy named Peter Cruz in 1991. Williams spent the next 34 years fighting to prove his innocence.

3. Williams had nothing to do with the murder. Not one piece of physical evidence ever connected him to the crime, he had no motive for the killing, and Defendant Officers had no reason to think he was responsible.

4. Williams had never met the decedent Cruz in his life.

5. Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence that Defendant Officers knowingly fabricated, including false eyewitness identifications and statements.

6. The evidence knowingly fabricated by Defendant Officers includes an eyewitness account from Wilfredo Torres falsely implicating Plaintiff in the crime.

7. Torres has now testified that Defendant Officers forced him, through threats and physical abuse, to falsely identify Plaintiff as the shooter, despite the Defendant Officers' knowledge that Plaintiff could not have committed this crime.

8. Plaintiff had an alibi—he was home with his wife, Joethel Griffin, at the time of the murder.

9. Defendant Officers knew that Plaintiff was home with his wife during the time period of the murder.

10. To undermine Plaintiff's truthful alibi, the Defendant Officers knowingly fabricated police reports and documented a different, false timeline of Plaintiff's whereabouts at the time of the murder.

11. In order to further undermine Plaintiff's alibi, Defendant Officers and ASA Defendant Becker knowingly falsified statements by Plaintiff's wife, Joethel Griffin.

12. Defendant Officers threatened to harm Griffin's children if she failed to adopt their fabricated evidence and timeline—which Defendant Officers knew was false.

2

13. To further ensure Plaintiff's wrongful conviction, Defendant Officers suppressed evidence of Plaintiff's innocence, including evidence that would have been used to impeach the testimony of the witnesses against him and that would have led police to the true killer.

14. The horrors inflicted on Plaintiff are not an anomaly: Williams is one of more than 50 other people who have had convictions on murder charges vacated after being framed in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

15. Plaintiff has maintained his innocence since the day he was arrested. In his statement at allocution—after his conviction and awaiting sentencing, when admitting to the crime could garner leniency from the Court—Plaintiff cried out: "I did not kill this person, your Honor, I've never seen this person in my life."

16. Finally, many years after Plaintiff's nightmare began, the truth about Defendant Guevara and his associates' misconduct has come to light.

17. The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

18. In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment rights not to incriminate themselves in response to questions about their misconduct as police officers.

19. Defendant Guevara has pleaded his Fifth Amendment right not to incriminate himself in response to questions about his misconduct specifically related to Williams's wrongful conviction and the investigation of the Cruz murder.

20. More than three decades after Plaintiff's wrongful arrest and conviction, Williams was exonerated, the criminal court vacated his conviction, and all charges against him were

dropped on March 27, 2025.

21.     Plaintiff now seeks long-overdue justice for the loss of his liberty and terrible hardship he endured and continues to suffer because of the Defendants' misconduct.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action under 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

23.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

24.     Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

## PARTIES

25.     Plaintiff Tyrece Williams, a lifelong Chicagoan, spent more than 18 years wrongfully imprisoned and 34 years fighting false charges for a murder he did not commit.

26.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Stephen Gawrys, Raphael Ramos, William O'Donnell, John Leonard, and Ernest Halvorsen, were officers at the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these defendants in his individual capacity.

27.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

28.     At all relevant times, Edward Kijowski, Edward Mingey, Stephen Kuhn, and

4

Robert Biebel supervised the Police Officer Defendants. Defendants Kijowski, Mingey, Kuhn, and Biebel participated in the misconduct alleged in this complaint and facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

29.     The City of Chicago is an Illinois municipal corporation that employs or employed the above-named defendants. At all relevant times, each individual defendant acted as an agent or employee of the City.

30.     At all relevant times, Defendant Paula Becker was an Assistant Cook County State's Attorney. She is sued for actions she undertook in her capacity as an investigator and without probable cause to believe Plaintiff had committed a crime. Plaintiff sues Defendant Becker in her individual capacity. She is referred to as "ASA Defendant Becker" throughout this Complaint.

31.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of ASA Defendant Becker. Defendant Cook County is a necessary party to this lawsuit because Defendant Cook County is responsible for paying any judgment entered against the ASA Defendant.

32.     Each and every individual Defendant acted under the color of law and within the scope of their employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in their individual capacity unless otherwise noted.

## FACTS

### The Crime

33.     Early in the afternoon of April 20, 1990, two young teenagers, Wilfredo Torres and Peter Cruz were walking together in the Logan Square neighborhood, when they stopped at the

corner of Dickens Avenue and Drake Avenue.

34.     Peter Cruz, who lived just a few blocks north of the Dickens and Drake intersection, asked Torres to watch his back as he walked home. Torres agreed, and Cruz proceeded northbound on Drake Avenue.

35.     Cruz made it roughly two blocks before he was confronted by a man and a pit bull.

36.     A struggle ensued, and Torres, from a few blocks away, realized that his friend was in trouble. There was a reason Cruz had asked Torres to watch out for him that afternoon—he had been threatened recently. Torres began running up Drake Avenue towards Cruz and his attacker.

37.     As Torres got closer, he witnessed the attacker choking Cruz and striking his face with a bottle. Meanwhile, the pit bull bit Cruz's legs and face.

38.     Torres arrived at the scene of the struggle, and he tried to pull Cruz's attacker away from Cruz, first by jumping on his back.

39.     Cruz grabbed at his attacker's arms to restrain him. During the struggle, Torres heard Cruz call his assailant the name *Anthony*.

40.     Cruz exclaimed something to the effect of "*Anthony*, why are you doing this?"

41.     When Torres realized he would not be able to restrain the attacker by jumping on his back, he reached for an object lying on the ground nearby.

42.     While Torres reached for something to hit the assailant with, Cruz's attacker pulled a handgun from his waistband.

43.     When Torres saw the attacker's gun, Torres ducked his head down and ran into an alley.

44.     The attacker then fired two shots at Cruz. One struck Cruz in the left wrist. The other struck Cruz in the upper left chest.

45.     The attacker fled southbound on Drake and westbound on Palmer, accompanied by the pit bull.

46.     Shortly thereafter, a woman named Wanda Tirado drove southbound on Drake Avenue at the Palmer intersection. Cruz managed to stumble to her car, and Tirado stopped. She opened the passenger-side door. Cruz pleaded with her to help him and collapsed into the car.

47.     An ambulance arrived and transported Cruz to the hospital, where he was pronounced dead sometime later.

### Tyrece Williams

48.     At the time of the crime, Plaintiff was 22 years old.

49.     He lived on the 26-block of West Haddon Avenue, more than two-and-a-half miles away from the scene of the Cruz homicide.

50.     He had never met the teenagers Peter Cruz and Wilfredo Torres.

51.     Williams lived a quiet, family-oriented life as a father of three with another on the way.

52.     On April 19, 1990—the day before the Cruz homicide—Plaintiff was at home, celebrating his wife's birthday.

53.     In the early morning hours of April 20, 1990—the day of the Cruz murder—Plaintiff was told that his brother, Antwan, had been the victim of a stabbing. Plaintiff went to visit his brother at the hospital.

54.     Sometime in the daylight morning hours later that day, Plaintiff left the hospital and returned home.

55.     Plaintiff and his wife, Josie Griffin, spent the entire day resting in their home.

56.     Cruz was killed around 2:00 pm on April 20, 1990.

57.     Plaintiff and his wife were at home when the crime occurred. He had nothing to do with the crime.

**Initial Police Investigation Reveals Witnesses Could Not Describe or Identify the Shooter**

58.     Officers from the Chicago Police Department responded to the incident on the night of the crime and identified several potential eyewitnesses, including Wilfredo Torres, James and Nancy Bigdron, Edwina Hawk, Edwin Garcia, and Wanda Tirado.

59.     When witnesses were interviewed by officers and detectives in the hours after the shooting, they explained what they could observe about the shooter. Many could give no description at all.

60.     Some eyewitnesses gave vague descriptions of the perpetrator, such as his clothing and general descriptions of race, height, and weight—possibly a Black male, approximately 18 years old and between 5'6" and 5'8" tall, wearing a black cap, dark pants, a white hooded sweatshirt, and a jacket.

61.     Detectives from the Area 5 Violent Crimes Division, including Defendant Ernest Halvorsen, were assigned to the follow-up investigation.

62.     Defendant Sergeant Kuhn was assigned to supervise the investigation.

63.     Defendants Halvorsen and Leonard interviewed witnesses at the scene immediately following the shooting on April 20, 1990.

64.     Defendants Halvorsen and Leonard interviewed Wanda Tirado, who said that she saw a Black male run south on Drake and then west on Palmer.

65.     Defendants Halvorsen and Leonard interviewed James and Nancy Bigdron, who said that the offender fled South on Drake and then west on Palmer, accompanied by a beige and brown dog.

66.     Defendants Halvorsen and Leonard interviewed Edwin Garcia, who explained that he heard two shots, and then saw the dog—a palomino pit bull—and offender flee south on Drake.

67.     Defendants Halvorsen and Leonard interviewed Wilfredo Torres, who said he approached the struggle, picked up a stick, and was forced to back off when the offender drew his weapon. Torres stated that the offender fled south on Drake and west on Palmer.

68.     Following Defendant Leonard and Halvorsen's witness interviews, Defendant Leonard noted the name "Anthony" in a General Progress Report.

69.     Defendant Leonard and Defendant Halvorsen also interviewed Edwina Hawk, who observed the attack from her nearby window and confirmed the same vague details as other witnesses.

70.     The Detectives reported the general description of the offender, compiled from their interviews of these witnesses, as a Black man, 18 to 20 years old, 5'6" to 5'8" tall, wearing a gray hooded sweatshirt, blue jeans, and white gym shoes.

71.     The Defendant Officers also noted that the offender was "[p]ossibly known to the victim as Anthony."

72.     Sometime after the initial interviews, Defendant Officers discovered that an individual named Angelo Price, a 22-year-old Puerto Rican man, used the alias "Anthony Monroe."

73.     Defendant Officers submitted a records inquiry for Angelo Price. The records report stated that Price lived nearby the scene of the murder, and that Price was roughly 22 years old (at the time of the Cruz homicide), 5'9" tall, and 175 pounds.

74.     The initial investigating officers also pulled records for a November 9, 1987 aggravated battery arrest of an individual named Mark Johnson. Johnson is described as a Black

male, 5'7" to 5'9" tall.

**Detective Guevara is Assigned to the Case, Immediately Targets Plaintiff, Manufactures Evidence to Falsely Implicate Him, and Suppresses Evidence of his Innocence**

75.     The police investigation of the Cruz murder lay dormant for three weeks after the crime occurred.

76.     On May 12, 1990, Defendants William O'Donnell, Raphael Ramos, Reynaldo Guevara, and Stephen Gawrys were assigned to the Cruz homicide investigation by Defendant Sergeant Edward Mingey.

77.     After weeks in which there was no investigation of the murder, Defendant Officers claimed to have suddenly cracked the case.

78.     Defendant Officers fabricated an anonymous tip to falsely claim that sources on the street told the Defendant Officers that Plaintiff was responsible for the Cruz homicide.

79.     In fact, this story was knowingly and wholly fabricated by Defendant Officers. They selected Plaintiff as their suspect first, and then they went about fabricating evidence to implicate him.

80.     Once the Defendant Officers decided to fabricate a case against Plaintiff, Defendant Officers suppressed evidence implicating the true perpetrator.

81.     Defendant Officers suppressed the identity of "Anthony," the real perpetrator, and an investigation into him.

82.     Instead, Defendants O'Donnell and Ramos obtained a photo of Plaintiff. In coordination with them, Defendants Guevara and Gawrys then brought Wilfredo Torres to Area 5.

83.     Torres, who saw his friend murdered in front of him less than one month prior, was fifteen years old at the time and despite asking for his mom to be there, found himself alone with detectives.

84.     At Area 5, Defendant Guevara showed Torres a photo of Plaintiff.

85.     Defendant Guevara then instructed Torres to falsely identify Plaintiff as the shooter—despite Guevara's knowledge of Plaintiff's innocence.

86.     Torres told Defendant Guevara that he had not seen the face of the shooter, and that he could not identify Plaintiff as the shooter.

87.     Defendant Guevara then handed the photo of Plaintiff to Torres and told Torres that Plaintiff had a pit bull.

88.     Guevara again knowingly instructed Torres to falsely identify Plaintiff as the person who shot his friend.

89.     When Torres tried to resist falsely implicating Plaintiff, Defendant Guevara became enraged and aggressive.

90.     When Torres maintained that he could not make an identification, Defendant Guevara punched Torres in the stomach and smashed the young teenager's head against the cement wall.

91.     Following this physical abuse, Defendant Guevara told Torres again to say that the photo of Plaintiff matched the perpetrator.

92.     Stunned that an adult he thought he could trust had just punched him and shoved his head against a cement wall, Torres cowered in fear at Defendant Guevara's authority and demands.

93.     Torres, just fifteen years old, terrified by Defendant Guevara's threats and abuse, acquiesced to Defendant Guevara's demand that he falsely adopt Guevara's false story that Plaintiff was the shooter in the Cruz homicide.

94.     Having fabricated evidence to implicate Plaintiff, Defendants Guevara and Gawrys

11

then arrested Plaintiff on May 12, 1990 at approximately 8:00 PM.

95.    Plaintiff Williams had been walking to the store to pick up items for his mother when detectives unexpectedly pulled up, jumped out of their car, and grabbed him.

96.    Defendant Officers then conducted a lineup procedure that including Plaintiff for Torres to view.

97.    Defendant Officers instructed Torres to falsely pick the same person whose photograph Guevara had shown to him, despite knowing the falsity of the identification.

98.    Torres viewed the lineup and did as Defendant Offices told him, selecting Plaintiff as the shooter.

99.    On May 13, 1990, Defendants Guevara, Ramos, Gawrys, and Edward Mingey conducted another lineup with an additional purported eyewitness, Edwina Hawk.

100.    Hawk could not make an identification.

101.    But after Defendant Guevara and the other Defendant Officers threatened her and told her to select Plaintiff, she falsely identified Plaintiff.

102.    During this time, Defendant Officers also discovered and photographed a deceased pit bull matching the description of the pit bull used in the murder.

103.    The photographs and location of the pit bull suggested an alternate perpetrator, so Defendant Officers suppressed the photographs and any investigation into the dog in order to further conceal Plaintiff's innocence.

**Defendants Conspire to Falsify Their Reports**

104.    Defendant Officers falsified the details and timeline of their investigation in their reports.

105.    Defendants O'Donnell and Ramos knowingly and falsely reported that officers

12

showed Torres Plaintiff's photo as part of a photo spread. Torres was only ever shown one photo—a single photo of Plaintiff—and not a photo spread.

106.    In addition, Defendant Officers knowingly and falsely reported that Torres identified Plaintiff in a legitimate lineup procedure, when the procedure had been rigged and Torres was instructed to falsely pick Plaintiff.

**Defendant Officers Fabricate and Conceal Evidence to Undermine Plaintiff's Alibi**

107.    When Defendant Officers questioned Plaintiff about his involvement in the Cruz shooting, he denied any knowledge and any involvement in the crime.

108.    When Defendant Officers revealed to Plaintiff the date and time of the shooting of which he was being accused, Plaintiff provided an alibi that proved he could not have committed the Cruz shooting—he had been with his partner Joethel Griffin in their home.

109.    To frame Plaintiff for the murder, the Defendant Officers created police reports containing false information about his alibi in order to undermine his credibility and destroy Plaintiff's ability to present an alibi defense.

110.    As this nightmare unfolded, Plaintiff's partner Joethel Griffin, who was pregnant with the couple's fourth child, was at home with their three young children, scared and confused about why the police had taken Plaintiff.

111.    Suddenly, in the dead of the night, Defendant Guevara and other Defendant Officers came to Griffin's home and told her she had to go to Area Five. The Defendant Officers forced Griffin to leave her three sleeping children alone.

112.    Terrified and exhausted, Griffin arrived at the police station at approximately 3:15 AM on May 13, 1990. Defendants Guevara, O'Donnell, and ASA Defendant Becker interviewed Griffin. Griffin confirmed Plaintiff's alibi and explained to the police that Plaintiff had gone to the

hospital to visit his brother, but returned in the early morning daylight hours and rested in their home all day.

113. Griffin never told Defendant Officers or ASA Defendant Becker an exact time or range of times when Plaintiff returned home from the hospital on April 20. Nonetheless, the Officer Defendants wrote a false police report claiming that Griffin had provided a time range during which Plaintiff was gone from the house and could have committed the murder.

114. Similarly, ASA Defendant Becker knowingly prepared a false statement for Griffin to sign, which says that Griffin recalled Plaintiff returning home from visiting his brother at the hospital on April 20 as late as 2:30 PM, which would have given him just enough time to have committed the Cruz homicide around 1:50 PM, on his way home.

115. The Defendant Officers told Griffin that if she signed the statement, she could go home to her sleeping children. Griffin was terrified and confused as to why she would sign a statement. As Griffin resisted signing the statement, the Defendant Officers became increasingly agitated and aggressive—ultimately threatening Griffin that if she did not sign the statement, they would do something to her children or take them from her. Griffin was afraid for her children's safety. Ultimately, Griffin acquiesced to the Defendant Officers' threats and signed the false statement written by ASA Defendant Becker.

116. ASA Defendant Becker was present during Griffin's questioning by police and participated personally in the interrogation. ASA Defendant Becker assisted the Defendant Officers in fabricating Griffin's false statement to undermine Plaintiff's alibi and secure a conviction, despite knowing its falsity.

**Plaintiff's Wrongful Conviction and Imprisonment**

117. As a result of Defendant Officers' misconduct and based on the false evidence they

manufactured, Defendant Officers arrested Plaintiff for the murder of Peter Cruz.

118.    There was no weapon or other physical or forensic evidence connecting Plaintiff to the crime.

119.    Nevertheless, Plaintiff was charged with murder, assault, and unlawful use of a weapon.

120.    At trial, the State's case hinged on the fabricated testimony and identifications.

121.    Because Griffin's signed statement, which had been fabricated by the Defendant Officers, contradicted Plaintiff's own testimony about his alibi, Plaintiff could not testify. In addition,  by knowingly falsifying Griffin's statement, the Defendant Officers and ASA Defendant Becker had ensured that Griffin could not testify to Plaintiff's truthful alibi—if she took the stand, the prosecutors would impeach her with the false statement intentionally concocted by the Officer Defendants and ASA Defendant Becker.

122.    Defendant Officers' false police reports were used in the criminal case against Plaintiff. Because of the Defendant Officers' fabrication of police reports, Plaintiff was deprived of the ability to contest the legitimacy of the witness accounts and identifications implicating him.

123.    On May 6, 1991, a judge found Plaintiff guilty of first-degree murder, assault, and unlawful use of a weapon. The court sentenced Plaintiff to thirty-five years in prison.

124.    Without Defendant Officers' fabricated witness accounts, Plaintiff would never have been convicted.

125.    Throughout the criminal proceedings, the Defendant Officers suppressed critical evidence demonstrating Plaintiff's innocence and which Plaintiff and his attorney could have used to impeach State's witnesses.

126.    If Defendant Officers had not suppressed that evidence, Plaintiff would never have

been convicted.

127.    The following decades of Plaintiff's life were consumed by the horror of his wrongful imprisonment.

128.    Defendant Officers' misconduct stole from Plaintiff what should have been the most formative time of his life: most of his twenties and all of his thirties.

129.    Plaintiff was also taken away from his young family, including his girlfriend and their four young children.

130.    When his life should have been beginning, Plaintiff was instead locked in prison, deprived of the chance to care for and be cared for by his family, develop skills and a career, and pursue his interests and passions.

131.    Indeed, Plaintiff was deprived of all the basic pleasures of human experience that free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

132.    Plaintiff never knew whether the truth would come out or whether he would be exonerated.

133.    After Plaintiff's release, one of his first stops was to the cemetery: Plaintiff's mother, brother, grandparents, and many other family members died during Plaintiff's long and grueling wrongful incarceration. He was denied the opportunity to attend any of their funerals.

134.    Plaintiff's mother and family knew he was innocent and stood by his side throughout his wrongful incarceration. As Plaintiff's mother aged, separated from her son for multiple decades, she told family members that she knew the truth would come out someday. Tragically, his mother died before she could see her son freed and before the truth came to light about the Defendant Officers' misconduct.

135.    Plaintiff's suffering did not end with his release from prison. Defendant Officers'

misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering,

humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and

psychological effects.

**Plaintiff's Exoneration**

136.    Plaintiff steadfastly maintained his innocence before his conviction, after his trial,

and after his release from prison.

137.    Plaintiff's post-trial motions and direct appeal were all unsuccessful.

138.    Years later, Defendant Guevara was asked under oath if he framed Plaintiff for the

Cruz homicide, and Guevara invoked his right to remain silent so as not to incriminate himself.

139.    After Guevara's misconduct had come to light, Plaintiff filed a petition for relief

from the criminal court's judgment and to vacate his conviction.

140.    Judge Carol Howard of the Cook County Circuit Court vacated Plaintiff's

convictions.

141.    On March 27, 2025, the State made a motion of nolle prosequi, and the Court

dismissed all charges against Plaintiff.

142.    At the time of his exoneration, Plaintiff had been fighting the false charges against

him for more than half of his life.

**Chicago's Policy and Practice of Wrongly Convicting
Innocent People in Violation of the Constitution**

143.    The City of Chicago and the Chicago Police Department are responsible, by virtue

of their official policies, for inflicting miscarriages of justice in scores of criminal cases like

Plaintiff's case.

144.    Since the 1980s, at least 100 cases have come to light in which Chicago police

officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

145. In many of these cases, Chicago police officers used the same tactics Defendant Officers employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

146. At all relevant times, members of the Chicago Police Department, including Defendant Officers in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew were inaccurate.

147. At all relevant times, members of the Chicago Police Department, including Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

148. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendant Officers, concealed exculpatory evidence from Plaintiff.

149. The existence of this policy and practice of suppressing exculpatory and/or

impeaching material in clandestine files was established and corroborated in the cases of Rivera v. Guevara, No. 12-cv-4428 (N.D. Ill.), Fields v. City of Chicago, No. 10-cv-1168 (N.D. Ill.), and Jones v. City of Chicago, No. 87-cv-2536 (N.D. Ill.), among others.

150.    The policies and practices of file suppression exposed in Fields were in place from the 1980s through the 2000s, including at the time of the investigation at issue here.

151.    In addition, a set of clandestine files related to Area 5 homicides—the same detective division involved in this case—was found in the case of Rivera v. Guevara, No. 12-cv-4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

152.    The City of Chicago and the Chicago Police Department also routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City knew about this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

153.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases where Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

154.    Before and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further,

19

the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

155.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Guevara and Miedzianowski worked together in the CPD gang crimes unit before Guevara became homicide detective. Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski and to pressure drug dealers who did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

156.     In *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a verdict against the City, finding it responsible for maintaining both a code of silence and a deeply flawed disciplinary system. This system allowed Chicago police officers (operating out of the very same police facilities as Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

157.     The Klipfel plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among gang crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

158.     Leaders of the Chicago Police Department and elected officials in Chicago have

acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the misconduct at issue in this case.

159.    As a result of the City of Chicago's established practices, officers (including Defendant Officers here) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

160.    This belief extends to Defendant Officers in this case. For example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear the City of Chicago and its police department would ever discipline them for doing so.

161.    The City of Chicago and its police department also failed in the years before Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

   a.   The conduct of live lineup, photographic, and other identification procedures.

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding.

c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

162. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

163. The City's failure to train, supervise, and discipline its officers, including the individual Defendant Officers in this case, condones, ratifies, and sanctions the kind of misconduct that Defendant Officers committed against Plaintiff.

164. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

165. The policies and practices described in the foregoing paragraphs were also

approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

## Defendant Guevara's History of Framing Innocent Persons

166.    As a result of the Chicago Police Department's policies and practices described above, Defendant Guevara has framed dozens of innocent people over the span of two decades. These victims have lodged independent accusations of similar misconduct against Defendant Guevara.

167.    As of the filing of this complaint, 51 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Antonio McDowell, and Plaintiff Tyrece Williams. These men and women served hundreds of years in prison for crimes they did not commit.

168.    Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and

witnesses, and using physical and psychological violence, all in the course of maliciously prosecuting innocent people.

169.     In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

170.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe the City of Chicago and its police department condoned his behavior.

171.     Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Guevara has refused, for example, to respond to allegations that he manipulated dozens of witnesses to provide false identifications; fabricated false evidence; suppressed exculpatory evidence, including documentary evidence; tortured and abused suspects and witnesses and coerced false statements from them; and committed the misconduct detailed below.

172.     The following are examples of Defendant Guevara's misconduct:

a.     In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

b.     In 1982, Defendant Guevara and three other officers broke through Almarie

Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

c.  In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten on the head, face, and body until he confessed to murder and robbery. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until he confessed. The criminal court suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

d.  In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

e.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly punched Munoz in the mouth. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on and beat Munoz.

f.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint

with OPS. Guevara denied the charges, but OPS found Guevara had lied about the incident and recommended Guevara be suspended for two days.

g.　In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him with their hands and flashlights.

h.　In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

i.　In 1988, Defendant Guevara, in concert with his partner Steve Gawrys, and under the supervision of Ed Mingey, caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was wrongfully convicted of the Valentin murder.

j.　Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

k.　In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get

inside his car, showed Perez a photo of Johnson, and told Perez he wanted Johnson to take the blame for the murder.

l.   In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which Ortiz later recanted.

m.   In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

n.   In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

o.   In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

p.   In 1990, Defendant Guevara paid two juvenile witnesses to falsely identify a suspect from a photo array in a shooting investigation, leading to the suspect's wrongful conviction.

q.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in

the crime. Rosario recanted his identification of Arcos at trial, but Arcos was still wrongfully convicted.

r.     In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, though they later recanted citing Guevara's misconduct.

s.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for 50 years. Guevara then promised Rivera that if he signed a statement, he could go home.

t.     In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. Guevara also manipulated and fabricated three other eyewitness identifications of Johnson as the shooter.

u.     In 1992, Defendant Guevara illegally prevented any adult or youth officer from being present while he interrogated juvenile Jacqueline Montanez. As a result, Montanez was wrongfully convicted of murder.

v.     In 1993, Defendant Guevara coerced Carl Richmond into falsely identifying Robert Bouto as the murderer of one of Richmond's friends.

w.     In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating

himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

x.    In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. During the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face by Guevara, and beaten by two other officers. Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to falsely confess.

y.    In 1993, Defendant Guevara physically abused and threatened Francisco Vicente to coerce him into falsely implicating Geraldo Iglesias in a murder. Vicente later testified Guevara and other officers beat him, threatened him, and fed him facts to facilitate the false story.

z.    In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by beating him and telling him he could go home if he signed a statement.

aa.    In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses falsely identified Davila as the perpetrator.

bb.    In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification

and providing false testimony to the Grand Jury by threatening Diaz that, if she did not falsely identify Luis Serrano as the shooter, the Department of Children and Family Services would take away her children.

cc.    In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator knowing Figueroa did not see anything, causing Figueroa to be wrongfully convicted.

dd.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores. During Ortiz Bordoy's hours long interrogation, Guevara yelled in her face, swore at her, threatened that DCFS would take her children, and threatened to hit her.

ee.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez as the perpetrator of a shooting.

ff.    In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Guevara as much. In addition, Guevara wrote false reports saying Melendez and another man identified a car as the one used in the shooting.

gg.    In 1995, Defendant Guevara coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of an interview room and refusing his requests for an attorney. During the 11-hour interrogation, Guevara yelled at him, slapped him, and told him if he did not confess, he would never see the light of day.

hh.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor she had falsely identified an individual in a lineup at Guevara's

direction. The prosecution abandoned murder charges against that individual.

ii.  In 1996, Defendant Guevara framed Louis Robinson for murder after Robinson refused to pay Guevara protection money or falsely identify Guevara's chosen suspect in a different crime. Guevara coerced an eyewitness into identifying Robinson from a photo array and a lineup and fabricated evidence that Robinson lied about his alibi.

jj.  In 1997, Defendant Guevara coerced Robert Ruiz into falsely implicating Freddy and Concepcion Santiago for the murder of Guevarra's nephew. Guevara detained Ruiz repeatedly over a 10-day period, locking him in an interrogation room without food, water, or access to the bathroom. Guevara told Ruiz who to identify and what to say in his statement.

kk.  In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Guevara interrogated Dembski, a Polish national who did not speak English, without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

ll.  In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not.

mm.     In 1997, Defendant Guevara coerced witnesses into identifying Oscar Soto from lineups in two separate murder investigations, even though witnesses had identified the true perpetrator of one of the crimes ten days earlier, before Guevara was ever involved in the investigation.

nn.     In 1998, Defendant Guevara tried to extract a false confession from Rosauro Mejia by beating Mejia. Mejia never confessed and was finally released after being held in custody for three days.

oo.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her on the back of her neck while interrogating her.

pp.     In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

qq.     In 1998, Defendant Guevara beat Gabriel Solache while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

rr.     In 1999, Defendant Guevara and his colleagues used physical violence to coerce David Gecht into adopting a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

ss.     In addition, Guevara coerced Gecht's pregnant girlfriend, Colleen Miller, into falsely implicating Gecht in a shooting, telling her she would be arrested and her baby would be born in prison and taken from her if she did not cooperate.

tt. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial where Guevara was testifying and watched other witnesses' testimony. She told Guevara about the other witnesses' testimony before he took the stand, in violation of a court order sequestering witnesses.

uu. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The FBI reported that Guevara, while acting as a police officer, solicited bribes from drug and gun dealers in exchange for the promise not to arrest them; took bribes to alter lineups of murder suspects; and took cash in exchange for dismissing murder cases he investigated.

vv. In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup.

173. Neither the City of Chicago nor the Chicago Police Department ever disciplined Defendant Guevara for any of the above misconduct.

174. Indeed, Defendant Officers engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

175. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

176. As described in detail above, Defendant Officers, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of

his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

177.    In the manner described above, the Defendant Officers fabricated witness statements falsely implicating Plaintiff in the crime.

178.    The Defendant Officers knew this evidence was false.

179.    The Defendant Officers obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

180.    In addition, the Defendant Officers deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that the Defendant Officers had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

181.    In addition the Defendant Officers concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

182.    The Defendant Officers also procured supposed eyewitness identifications of Plaintiff, which they knew were false and unreliable, using threats and violence to force witnesses to identify Plaintiff. The Officer Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

183.    The Defendant Officers' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial.

184.    Absent the Defendant Officers' misconduct, Plaintiff's prosecution could not and would not have been pursued.

185.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

186.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

187.    The Defendant Officers undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

188.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

189.    In the manner described above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff. They did so without any probable cause and despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

190.    In so doing, these Defendant Officers maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

191.    The misconduct described in this Count was objectively unreasonable, and Defendant Officers undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

192.     As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

193.     Defendant Officers undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

194.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

195.     As described above, during the constitutional violations described in this complaint, one or more of the Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

196.     The Defendant Officers had ample, reasonable opportunities—and the duty—to prevent this harm but failed to do so.

197.     The misconduct described in this Count was objectively unreasonable, and the Defendant Officers undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

198.     As a result of these Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

199.     The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

200.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

201.    As described more fully above, the Officer Defendants acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to both fabricate and suppress evidence to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

202.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

203.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

204.    The misconduct described in this Count was objectively unreasonable, and Defendant Officers undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

205.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

206.    Defendant Officers undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

## COUNT V
### 42 U.S.C. § 1983 – Policy and Practice against the City of Chicago

207.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

208.    As described in detail above, the City of Chicago is liable for the violation of

Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

209.    At all relevant times, and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

210.    At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated and false photographic or live lineup procedures.

211.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including the following: (1) individuals were subjected to unreasonably long and

uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training or knowledge of necessary safeguards against abusive conditions and involuntarily and/or false confessions; and (6) supervisors with knowledge of permissible interrogation techniques did not properly supervise or discipline officers and employees, causing coercive interrogations to continue unchecked.

212.    In addition, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witnesses' statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

213.    These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like those affecting Plaintiff.

214.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

215.    As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

216.    Defendant Officers undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

217.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named Officer Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VI
### State Law Claim – Malicious Prosecution

218.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

219.    As described above, the Officer Defendants, acting as an investigators, individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

220.    In so doing, Defendant Officers caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. Those judicial proceedings were

instituted and continued maliciously, resulting in injury.

221.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in March 2025.

222.    The misconduct described in this Count was objectively unreasonable and Defendant Officers undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

223.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

224.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

225.    The actions, omissions, and conduct of the Defendant Officers as described above were extreme and outrageous. Their actions were rooted in an abuse of power and authority. And Defendant Officers undertook their actions intending to cause, or recklessly disregarding the probability their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

226.    As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Willful and Wanton Conduct

227.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

228.    At all times relevant to this complaint the Officer Defendants had a duty to refrain

from willful and wanton conduct in connection with the Cruz murder investigation.

229.     Notwithstanding that duty, Defendant Officers acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

230.     As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Civil Conspiracy

231.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

232.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

233.     In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

234.     The violations of Illinois law described in this complaint, including Defendant Officers' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendant Officers' conspiracy.

235.     The misconduct described in this Count was objectively unreasonable, and Defendant Officers undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

236. As a result of Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

237. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

238. While committing the misconduct alleged in the preceding paragraphs, the individual Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

239. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### 42 U.S.C. § 1983 – Due Process Against ASA Defendant Only
### (Fourteenth Amendment)

240. Plaintiff incorporates each paragraph of this complaint as if fully restated.

241. As described in detail above, ASA Defendant Becker, while acting individually, jointly, and in conspiracy with the Officer Defendants, as well as under color of law and within the scope of her employment, and in her capacity as an investigator, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

242. In the manner described more fully above, ASA Defendant Becker fabricated a false statement by Plaintiff's partner Griffin in order to help falsely implicate Plaintiff in the murder.

243. ASA Defendant Becker knew the evidence she helped fabricate was false.

244. In addition, ASA Defendant Becker suppressed material exculpatory and impeachment evidence about the truth of what Plaintiff's partner Griffin had told her and the Defendant Officers about Plaintiff's alibi.

245.     ASA Defendant Becker's misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

246.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

247.     As a result of the ASA Defendant Becker's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## COUNT XII
## State Law Claim - Indemnification

248.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

249.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

250.     The individual Defendant Officers were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

251.     Defendant City of Chicago is responsible to pay any judgment entered against the individual Officer Defendants.

252.     The ASA Defendant was an employee, member, and agent of Defendant Cook County, acting at all relevant times within the scope of her employment in committing the misconduct described herein.

253.     Defendant Cook County is responsible to pay any judgment entered against ASA

Defendant Becker.

WHEREFORE, Plaintiff Tyrece Williams respectfully requests this Court enter a judgment in his favor and against Defendants Reynaldo Guevara, Stephen Gawrys, Raphael Ramos, William O'Donnell, John Leonard, Geri Lynn Yanow as special representative for the Estate of Ernest Halvorsen, Edward Kijowski, Edward Mingey, Stephen Kuhn, the City of Chicago, Paula Becker, and Cook County, awarding compensatory damages, attorneys' fees, and costs against each defendant, punitive damages against each individual defendant, pre- and post-judgment interest, and any other relief the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Tyrece Williams hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: November 6, 2025                    Respectfully submitted,

                                           TYRECE WILLIAMS

                                           By: /s/_____
                                           *Counsel for Plaintiff*

                                           Jon Loevy
                                           Anand Swaminathan
                                           Steve Art
                                           Lyla Wasz-Piper
                                           LOEVY & LOEVY
                                           311 N Aberdeen St, 3rd Fl
                                           Chicago, IL 60607
                                           (312) 243-5900