IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRECE DERRICK WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) No. 25 C 13620 |
| | ) |
| | ) |
| REYNALDO GUEVARA, STEPHEN | ) |
| GAWRYS, RAPHAEL RAMOS, WILLIAM | ) |
| O'DONNELL, JOHN LEONARD, GERI | ) |
| LYNN YANOW as special | ) |
| representative for the ESTATE | ) |
| OF ERNEST HALVORSEN, EDWARD | ) |
| KIJOWSKI, EDWARD MINGEY, | ) |
| STEPHEN KUHN, ROBERT BIEBEL, | ) |
| the CITY OF CHICAGO, PAULA | ) |
| BECKER, and COOK COUNTY. | ) |
| | ) |
| Defendants. | |

Memorandum Opinion and Order

Tyrece Williams spent years in prison for the 1990 murder of Peter Cruz—an individual Mr. Williams has always maintained he never met and had no reason to harm—before being exonerated of the crime in 2025.[1] Following the vacatur of his conviction, his release from custody, and the State's *nolle prosequi* of the charges against him,

---

[1] It is unclear from Mr. Williams's submissions how many years he spent in custody for the Cruz homicide. His complaint alleges that he "spent *more than 18 years wrongfully imprisoned* and 34 years fighting false charges for a murder he did not commit." Am. Compl., ECF 111-1 at ¶ 25 (emphasis added). But his briefs in response to the pending motions each assert that he "spent 34 years in prison." ECF 95 at 2; ECF 113 at 1. Nothing in my analysis hinges on this detail.

Mr. Williams filed this action pursuant to 42 U.S.C. § 1983. He alleges that individual Chicago Police officers and their supervisors, together with a Cook County Assistant State's Attorney, fabricated incriminating evidence against him, suppressed exculpatory evidence, maliciously prosecuted him, failed to intervene to prevent the constitutional violations he alleges, and conspired to violate his constitutional rights and Illinois common law. Mr. Williams also claims that the City of Chicago is liable under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978), for the alleged deprivation of his constitutional rights and liable under the theory of *respondeat superior* for the state law violations committed by its employees. Finally, he claims that the City and County are liable for any compensatory damages awarded against their respective employees.

The City, County, and several individual defendants have answered the complaint. Assistant State's Attorney Paula Becker seeks dismissal of the claims against her under Fed. R. Civ. P. 12(b)(6). In a separate 12(b)(6) motion, defendants Stephen Kuhn and Robert Biebel,[2] who allegedly supervised other officer defendants and participated in the misconduct described, seek dismissal of all

---

[2] A Suggestion of Death filed on June 23, 2026, states that Mr. Biebel died on June 17, 2026. I presume that the parties will name an appropriate Special Representative on behalf of his estate and amend the complaint accordingly.

claims against them. For the reasons that follow, both motions are denied.

I.

According to the complaint, whose factual allegations I accept for purposes of the pending motions, defendants manufactured the evidence of Mr. Williams's involvement in the Cruz murder out of whole cloth, while suppressing exculpatory evidence. As Mr. Williams puts it, the defendant officers "selected [him] as their suspect first, and then they went about fabricating evidence to implicate him." Am. Compl., ECF 111-1 at ¶ 81. A portion of the allegedly fabricated and suppressed evidence is summarized below. There is more, but the following suffices for present purposes.

Mr. Williams's conviction rested heavily on the testimony of Wilfredo Torres, Cruz's 15-year old friend who witnessed Cruz's attack, and who tried to fend off the assailant by jumping on his back and restraining his arms, then fled when the assailant pulled a gun. *Id*. at ¶¶ 39-40, 45. The complaint alleges that during the struggle, Torres heard Cruz call his assailant "Anthony." *Id*. at ¶¶ 41-42. And indeed, defendant Officer Leonard, who, along with defendant Officer Halvorsen, interviewed Torres shortly after the crime, wrote the name "Anthony" in a post-interview investigation report. *Id*. at ¶¶ 69-70.

Officers Leonard and Halvorsen interviewed several other witnesses at the scene of the crime, some of whom provided general

3

descriptions of the shooter's age and general appearance. The notes these officers compiled after these interviews include the remark "[p]ossibly known to the victim as Anthony." *Id*. at ¶¶ 66-72. The officers later discovered that an individual named Angelo Price, whose age and stature roughly corresponded to witness descriptions of Cruz's assailant, used the alias "Anthony Munroe" and lived near the scene of the murder. *Id*. at ¶¶ 73-75.

No progress was made in the investigation for several weeks. But after defendant Sergeant Mingey assigned defendant Officers O'Donnell, Ramos, Guevara, and Gawrys to the investigation, a fabricated story suddenly emerged about anonymous "sources on the street" who said that Mr. Williams had killed Cruz. *Id*. at ¶¶ 78-80. Investigation into "Anthony" abruptly ceased – and evidence implicating him suppressed – as defendants set about building their case against Mr. Williams. *See id*. at ¶¶ 81-83. Defendants O'Donnell, Ramos, Guevara, and Gawrys brought Torres to the police station and showed him a photo of Mr. Williams. When Torres – who was interrogated alone despite asking for his mother - told the officers that he had not seen the shooter's face and could not identify him, an enraged Guevara punched Torres in the stomach and smashed his head against the wall. Torres then acquiesced to Guevara's demand that he identify Mr. Williams as the shooter. *Id*. at ¶¶ 91-95.[3]

---

[3] In their report, Defendants O'Donnell and Ramos falsely reported that Torres identified Mr. Williams from a photo "spread," when in

4

Later that evening, detectives arrested Mr. Williams, and defendant officers placed him in a lineup for Torres to view. The officers instructed Torres to identify the same person whose photograph Guevara had shown him, even though they knew that the earlier identification was false. *Id*. at ¶¶ 92-100. Torres acquiesced. In their investigation reports, the defendant officers failed to note that Torres identified Mr. Williams from the lineup after being instructed to pick the same man he had previously been beating into falsely identifying. *Id*. at ¶ 108.

Officers questioned Mr. Williams, who denied any knowledge or involvement in the Cruz murder. When Mr. Williams learned the date and time of the crime – around 2:00 p.m. on April 20, 1990 – he told the officers that he had an alibi: he had been resting at home with his partner and their children all day from the morning onward, having spent the pre-dawn hours at the hospital visiting his brother, who had recently been the victim of a stabbing. *Id*. at ¶¶ 55-58.

Defendant Guevara and other defendant officers then went to Mr. Williams's home in the middle of the night and demanded that his partner, Joethel Griffin, accompany them to the police station, leaving her young children sleeping at home alone. Griffin – then pregnant with the couple's fourth child – arrived at the police station at approximately 3:15 am, where she was interviewed by

---

fact, the only photo Torres was ever shown was of Mr. Williams. *Id*. at ¶ 107.

defendants Guevara, O'Donnell, and Becker. Am. Compl. at ¶¶ 112-113. Griffin confirmed Mr. Williams's account of his whereabouts the day of the Cruz murder: he went to the hospital to visit his brother in the early morning hours, then returned home later that morning and rested in their home all day. *Id.* at ¶ 114. But the defendant officers prepared a police report, and ASA Becker drafted a statement for Griffin to sign, both of which contained a false timeline that Griffin supposedly gave of Mr. Williams's comings and goings. Specifically, the police report falsely stated that Griffin told officers that Mr. Williams was out of the house for a period of time that would have enabled him to kill Cruz. Similarly, the witness statement prepared by ASA Becker, who participated in Griffin's questioning, said that Griffin recalled Mr. Williams returning home from visiting his brother in the hospital as late as 2:30 p.m. – late enough for him to have killed Cruz on his way home. *Id.* at ¶¶ 115-116. Griffin resisted signing the false statement; but after the officers threatened to harm her children or take them from her if she did not sign it, she acquiesced to their demand.

Mr. Williams alleges that at his trial, there was no physical evidence connecting him to Cruz's murder; the State's case hinged on fabricated witness testimony and identifications. *Id.* at ¶ 119.

## II.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must give the defendants fair notice of the basis for

the claims, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### 1. ASA Becker's motion

The complaint articulates two claims against ASA Becker: a due process claim based on her participation in fabricating the false timeline in Griffin's signed statement; and a *Brady* claim based on her suppression of the circumstances surrounding that statement. Becker argues that Mr. Williams's due process claim should be dismissed because Griffin's statement was not introduced against him at his criminal trial. For this argument, she cites cases such as *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ("[I]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement on anyone's liberty interest"); *Armstrong v. Daily* 786 F.3d 529, 553 (7th Cir. 2015) ("[w]e have observed, for example, that an accused has no claim against an officer who fabricates evidence and puts the evidence in a drawer, never to be used."); and *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("if the evidence hadn't been used against the defendant, he would

7

not have been harmed by it, and without a harm there is, as we noted earlier, no tort.").

Mr. Williams acknowledges that he must ultimately prove that Griffin's statement was used to deprive him of liberty "in some way." Resp., ECF 95 at 8 (quoting *Avery v. Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (a defendant who "manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way.") (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (alterations omitted)). He argues, however, that Becker's view that "use" of the fabricated evidence means that Griffin's statement must have been introduced at trial is too narrow. Mr. Williams points to cases such as *In re Watts Coordinated Pretrial Proc.,* No. 19-CV-1717, 2022 WL 9468206 (N.D. Ill. Oct. 14, 2022), where the court observed that "[n]umerous courts in this District...have read *Whitlock* to mean that a plaintiff plausibly alleges a fabricated evidence due process claim" when the fabricated evidence was used in some way that resulted in his conviction, "even in the absence of a trial," *id*. at *3 (citing, *inter alia*, *Carter v. City of Chicago*, No. 17 C 7241, 2018 WL 1726421, at *5 (N.D. Ill. Apr. 10, 2018) (the "due process violation—that is the liberty deprivation—caused by fabricated evidence results from its use to secure the defendant's conviction, not from its use at trial.")). Indeed, in *Fields*—one of Becker's lead authorities—the court suggested that a due process

8

claim may lie where "the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him." 740 F.3d at 1112.

Mr. Williams alleges that the false timeline in Griffith's fabricated statement advanced the prosecution against him because it compromised Griffin's ability to testify truthfully at trial, since the State would have used the statement to impeach her testimony and would not have disclosed the coercive manner in which Becker and others obtained her signature. *See* Am. Compl., ECF 111-1 at ¶ 123. In this way, Griffin's fabricated statement undermined Mr. Williams's alibi defense, since its incorrect timeline contradicted his statement that he was at home with Griffin and the couple's children from morning to evening on the day of the Cruz murder. *See id.* Mr. Williams's theory is that even though the prosecution did not present Griffin's statement in its case in chief, it strategically "used" the statement as a preemptive weapon for discrediting truthful witness testimony that Mr. Williams could have offered in his defense – testimony that would have exposed a fatal flaw in the State's case against him. These allegations, Mr. Williams insists, support an inference that defendants "used" Griffith's false statement to deprive him of his liberty, and that Becker's arguments to the contrary both construe the law too narrowly and rely on facts outside the complaint, which I may not consider at this juncture.

9

Indeed, though Becker insists that cases such as *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020), *Zambrano v. City of Joliet*, 141 F.4th 828, 829-830 (7th Cir. 2025), and *Mack v. City of Chicago*, 151 F.4th 887, 897-98 (7th Cir. 2025), have rejected Mr. Williams's interpretation of *Avery* and *Whitlock*, none of these decisions involved a motion to dismiss under Rule 12(b)(6), and none compels dismissal here.[4]

*Patrick*, for example, was an appeal of the trial court's denial of the defendants' post-trial motion challenging the Fourteenth Amendment fabrication of evidence jury instruction provided after the close of evidence. The Seventh Circuit held that the instruction "was incomplete in that it failed to explain that Patrick had the burden to prove that the fabricated evidence was used against him at his criminal trial and was material." 974 F.3d at 835. But the error was harmless, since the jury's liability determinations on other claims independently supported its damages award. *Id*. at 835-36. The court had no occasion to consider whether evidence not "introduced" at trial was nevertheless "used against" the defendant to deprive him of liberty.

---

[4] *Whitlock* itself was resolved at summary judgment, as was *Armstrong*, another case featured in Becker's motion. In *Fields*, the court affirmed the *denial* of a motion to dismiss. And in *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016), the plaintiff's due process claim was dismissed not because the fabricated evidence was not introduced at trial, but because the plaintiff was *acquitted* after his criminal trial and thus suffered no liberty deprivation as a result of the fabrication. *Id*.

10

Nor did *Zambrano* or *Mack*—both of which were decided on summary judgment—confront this question. In *Zambrano*, the court held that on the record before it, no reasonable jury could conclude that the allegedly fabricated evidence was material to the jury's verdict. 141 F.4th at 832 (observing that "the alleged fabrication...was not an issue at trial and was not relevant to the determination of his guilt."). And the claim in *Mack* failed "for the simple reason that [Mack] was acquitted. ... Here, the jury did not convict Mack of any crimes, and Mack has not alleged any post-trial deprivation of liberty." 151 F. 4th at 899.

I am mindful that another court in this district has rejected the theory Mr. Williams advances here: that "by virtue of [the] very creation" of fabricated witness statements, the defendants "put [the plaintiff] in a 'Catch-22'" that deprived him of "the opportunity to call the men as witnesses himself to rebut the State's theory of the case." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1160 (N.D. Ill. 2022). But *Brown*, too, was decided at summary judgment. After reviewing the evidentiary record, the court concluded that because the plaintiff "provide[d] no citation to record evidence to show that his attorneys would have called Harper or Ford as witnesses, but for their statements to the police," his theory was "purely speculative." *Id*. *Brown* illustrates that the viability of Mr. Williams's claim cannot be determined at this stage. Even in *Cruz v. Guevara*, No. 23 CV 4268, 2024 WL 4753672, at *6 (N.D. Ill. Nov. 12,

11

2024), where the court dismissed the plaintiff's due process evidence fabrication claim, it acknowledged that "it may be possible for evidence to satisfy a due process claim's materiality requirement without the evidence having been introduced at trial." *Id.*

In short, whatever challenges Mr. Williams may face to establish factually, and to explain legally, how the falsified timeline he claims ASA Becker and others incorporated into Griffin's statement was used to deprive him of his liberty, his allegations raise a facially plausible due process claim based on evidence fabrication.

Turning to Mr. Williams's *Brady* claim, Becker argues that this claim cannot survive dismissal because it merely recasts his evidence fabrication claim and because Mr. Williams already knew the facts he claims were suppressed. Neither argument is compelling. For the first, Becker cites *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *18 (N.D. Ill. June 4, 2020), for the proposition that "[f]ailing to disclose falsified evidence, or 'keeping quiet' about that evidence, is the same as a fabrication of evidence claim and cannot be recast as a *Brady* allegation." *Id.* at *19. But Mr. Williams alleges that ASA Becker failed to disclose not only the truthful substance of Griffin's statement but also the coercive tactics that Becker and others used to obtain Griffin's false statement. *Serrano* acknowledges that such allegations are sufficient to support a *Brady* claim. *See id.* at *18 ("[w]hile police detectives are not required to disclose all the circumstances surrounding their

12

investigation...they must disclose impeachment evidence, including the 'pressure tactics and inducements' used on a witness.")(citing *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015)).

Next, Becker's argument about what Mr. Williams "knew" about Griffin's interview depends on facts beyond those alleged in the complaint. Moreover, this argument rests on an inferential sleight of hand. That Mr. Williams knew his own whereabouts, i.e., the *facts* supporting his alibi defense, does not mean that he knew, prior to his trial, either: 1) what Griffin told Becker during her interview, or 2) the circumstances of that interview. *Cf.* Mot., ECF 63 at 9 ("[t]he notion that Griffin corroborated his alibi was known to Williams prior to his criminal trial."). Mr. Williams is entitled to develop evidence to show that Becker knew, but failed to disclose, exculpatory evidence "that Griffin was taken from her home and her children in the middle of the night and told she could not return to them until she signed the fabricated statement" and that "Becker and Defendants suppressed the statements Griffin made exonerating him." Resp., ECF 95, 14-15.

### 2. Officers Kuhn and Biebel's motion

Officers Kuhn and Biebel, whom Mr. Williams identifies as supervisory officers, argue that the § 1983 claims against them should be dismissed because the complaint does not sufficiently allege their personal involvement in any constitutional violation;

and that the state claims should be dismissed because they rely on conclusory allegations. Their arguments are unpersuasive.

As Kuhn and Biebel correctly observe, "[l]iability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). But *Horshaw* is another case decided at summary judgment, and the unobjectionable principle for which Kuhn and Biebel cite it does not support dismissal on the allegations here.

Kuhn and Biebel's authorities dismissing § 1983 claims under Rule 12(b)(6) are no more persuasive. For example, they cite *Koch v. Westerman*, No. CIV.07-CV-0004-MJR, 2009 WL 249222, at *6 (S.D. Ill. Feb. 2, 2009), in which the court dismissed the plaintiff's § 1983 claim against supervisory officers because "the allegations of the complaint and the attached exhibits indicate that the underlying constitutional violation was complete *before* the supervisors learned of it." *Id.* (original emphasis). That is not the sequence of events Mr. Williams alleges against Kuhn and Biebel. As these defendants acknowledge, Mr. Williams attributes specific conduct to various officers, and he alleges that, as supervisors, Kuhn and Biebel "participated in the misconduct alleged...and facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised." Am. Compl., ECF 111-1 at ¶ 30. These general

14

allegations are sufficient to put Kuhn and Biebel on notice of the nature of Mr. Williams's claims against them, and to plead a plausible claim for supervisory liability. *See Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (a supervisor is "deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent."). Mr. Williams is entitled to discovery to determine the extent of the supervisory officers' participation in, knowledge of, and approval of the specific misconduct he alleges.[5]

III.

For the foregoing reasons, the pending motions to dismiss are denied.

**ENTER ORDER:**

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: July 22, 2026

---

[5] To the extent these defendants suggest that Mr. Williams already has all of the information he needs in this connection based on "the procedural history predating the filing of the Complaint," Reply, ECF 121 at ¶ 6, this argument relies on facts outside the complaint and does not support dismissal under Rule 12(b)(6).

15